UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| KEVIN J. MORRISON, | ) |
| | ) |
| Defendant, | ) |
| | ) |
| and | ) |
| | ) |
| MILDRED K. MILLER, | ) |
| | ) |
| Relief Defendant. | ) |
| | ) |

Civil Action No.

**JURY TRIAL DEMANDED**

# 02-11647MLW

DOCKETED

## COMPLAINT

Plaintiff Securities and Exchange Commission ("Commission") alleges as follows:

### Summary

1.      This action arises from the false reporting and diversion of more than $4.7 million

in corporate assets of HPSC, Inc. ("HPSC") by Defendant Kevin J. Morrison ("Morrison"),

former executive vice president of American Commercial Financial Corporation ("ACFC"), an

HPSC subsidiary, to Relief Defendant Mildred K. Miller ("Miller"), a purported ACFC

customer.  Morrison caused material misstatements in HPSC's publicly-filed financial statements

for the periods ended December 31, 1997 through March 31, 2002 by regularly providing

fictitious financial reports to ACFC's president, HPSC and HPSC's outside auditors to cover-up

his fraud.

2.      On August 14, 2002, as a result of Morrison's conduct, HPSC restated its

financial statements for the years ended December 31, 1997 through December 31, 2001 and for

the quarters ended March 31, 2000 through March 31, 2002. The restatement reflects that

Morrison's fraud resulted in an overstatement of HPSC's net income and earnings per share from

4% up to 112% during these periods.

3.      By engaging in the activities alleged in this Complaint, Morrison committed fraud

in the purchase and sale of securities in violation of Section 10(b) of the Securities Exchange Act

of 1934 ("Exchange Act") and Rule 10b-5 thereunder. In addition, he circumvented HPSC's

system of internal accounting controls and falsified its books and records or caused them to be

falsified in violation of Section 13(b)(5) of the Exchange Act and Rule 13b2-1 thereunder.

4.      Unless enjoined, Morrison is likely to commit such violations in the future.

Accordingly, the Commission seeks: (i) entry of a permanent injunction prohibiting him from

further violations of the relevant provisions of the federal securities laws; (ii) disgorgement of all

ill-gotten gains, plus prejudgment interest thereon; (iii) the imposition of a civil monetary penalty

due to the egregious nature of his violations; and (iv) entry of an order prohibiting Morrison from

serving as an officer or director of a public company.

5.      Miller has been unjustly enriched and has no right to funds Morrison fraudulently

diverted to her from ACFC. Accordingly, the Commission seeks disgorgement of the unjust

enrichment she received, plus prejudgment interest thereon. In addition, because of the danger

that Miller may conceal, encumber or dissipate funds or assets received as a result of Morrison's

fraudulent conduct, the Commission seeks entry of an asset freeze order against Miller pending

resolution of this action.

## Jurisdiction

6.     The Court has jurisdiction over this action pursuant to Sections 21 and 27 of the Exchange Act [15 U.S.C. §§78u and 78aa]. Jurisdiction against Relief Defendant Miller is based on the foregoing sections and on Section 310 of the Judicial Improvements Act of 1990 [28 U.S.C. § 1367(a)]. Additionally, HPSC's principal place of business is in this District and many of the acts and practices alleged in this Complaint occurred in this District.

7.     The Commission brings this action pursuant to the authority conferred upon it by Section 21(d) and (e) of the Exchange Act [15 U.S.C. §§ 78u(d) and (e)].

8.     In connection with the conduct described in this Complaint, defendants directly and indirectly made use of the mails or the means or instruments of transportation or communication in interstate commerce.

## The Defendants and Relevant Entities

9.     Defendant **Kevin J. Morrison** is 53 and resides in West Hartford, Connecticut. From May 5, 1994 until he was asked to resign effective May 24, 2002, Morrison was an employee of HPSC, the executive vice president of it subsidiary, ACFC, and fulfilled the function of ACFC's chief financial officer. His duties and responsibilities included, among other things, overseeing all of ACFC's accounting, internal audit and loan underwriting functions. Morrison earned an MBA from the Amos Tuck School of Business, Dartmouth College and formerly was employed as an auditor by the accounting firm Arthur Andersen & Co. in Boston, MA. Morrison was registered as a Certified Public Accountant in Massachusetts until his registration lapsed in 1983.

3

10.     Relief defendant **Mildred K. Miller** is 53 and was last known to reside in Hartford, Connecticut. Miller was the owner of A-1 Staffing LLC ("A-1 Staffing") and its apparent successor, M.K.M. Professional Recruiters ("Professional Recruiters"). Both of Miller's firms were purported customers of ACFC.

11.     **HPSC, Inc.**, is a Delaware corporation with its principal place of business in Boston, Massachusetts. HPSC specializes in providing financing to dentists, doctors, and other licensed healthcare providers. HPSC reported approximately $53 million in revenues in 2001 and $3.2 million in net income. HPSC's common stock is registered with the Commission pursuant to Section 12(b) of the Exchange Act and trades on the American Stock Exchange.

12.     **American Commercial Financial Corporation** was founded in 1994 as a wholly-owned subsidiary of HPSC and is located in West Hartford, Connecticut. ACFC provides asset-based loans of $500,000 to $5 million to commercial and industrial businesses. The average ACFC loan is for a term of two to three years with a revolving credit line of $1 million. As of the end of 2001, ACFC had approximately $28 million in outstanding loans to a portfolio of 34 borrowers. Richard Mount has been its president since its founding in 1994.

## BACKGROUND

13.     In 1994, HPSC created ACFC as a wholly-owned subsidiary. ACFC's core business is asset-based lending, which involves making loans secured by the debtor's assets, including accounts receivable, inventory, and equipment. All ACFC asset-based loans are reviewed by the ACFC's credit committee, comprised of HPSC's chief executive officer, HPSC's president, HPSC's chief financial officer, ACFC's president, and Morrison.

4

14.     In addition to its asset-based lending program, a segment of ACFC's business is a lending program commonly referred to as "factoring." In its factoring program, ACFC purchases a portfolio of receivables from a customer. The receivables generally consist of outstanding invoices from the customer to a third-party obligor. ACFC advances the customer 60 to 80 percent of the receivables' face value, and in exchange, receives the right to collect 100 percent of the proceeds from the third-party obligor. When ACFC collects the proceeds, it deducts a fee and returns the remainder of the amount collected, less the amount advanced, to the customer.

15.     Morrison was in charge of ACFC's accounting department. He maintained ACFC's books and records, including its general ledger, had authority to disperse funds from any of ACFC's accounts, supervised the accounting staff, and reported ACFC's financial performance to HPSC and its outside auditors.

16.     Morrison had complete control over all aspects of ACFC's factoring business, including, but not limited to: (i) sole discretion to accept factoring customers on behalf of ACFC; (ii) sole responsibility for verifying the legitimacy of customers' accounts receivable; and (iii) sole discretion to make advances and otherwise disburse funds, collect payments, reconcile accounts, and report financial performance. Neither ACFC's credit committee nor its president, Mount, reviewed or approved transactions within ACFC's factoring portfolio.

## MORRISON'S FRAUDULENT SCHEME

### Morrison Diverted Over $4.7 Million to Miller

17.     In or about 1997, Morrison and Miller initiated a purported factoring arrangement whereby ACFC purported to advance money to Miller against the purchase of the accounts receivable of Miller's companies, A-1 Staffing and Professional Recruiters. At that time,

5

Morrison began making purported advances to Miller by wire or check in regular increments usually of $7,000 to $9,000 each.

18.     Morrison purportedly advanced funds to Miller against her companies' accounts receivable as follows:  at least $148,820 in 1997; at least $804,272 in 1998; at least $937,660 in 1999; at least $1,185,920 in 2000; at least $1,241,682 in 2001; and at least $437,472 from January 2002 through May 2002.  However, there were no invoices to support most of the advances Morrison made to Miller and in some instances advances were made based on fictitious invoices.  Moreover, ACFC did not collect any money from Miller's purported accounts receivable.

19.     In sum, during the period from 1997 through May 2002, Morrison transferred a total of at least $4,765,898 million in corporate funds to Miller, both directly and indirectly through her companies A-1 Staffing and Professional Recruiters, pursuant to their purported factoring arrangement.

### Morrison Covered-Up His Fraud
### By Circumventing Internal Controls
### and Creating Fictitious Books and Records

20.     From 1997 through May 2002, Morrison covered up his diversion of funds to Miller by altering ACFC's books and records and providing falsified financial reports to HPSC, Mount and HPSC's outside auditors.  The false reports understated ACFC's factoring or "purchased accounts receivable" account and offset the understatement by an overstatement of ACFC's cash accounts.

21.     Morrison maintained an accurate version of ACFC's general ledger on his office computer.  The factoring business was recorded in the "purchased accounts receivable" account

in the general ledger and included both (i) disbursements or advances (debits) made over time to

factoring clients, including Miller; and (ii) receipts (credits) from third-party obligors

corresponding to the accounts receivable purchased from factoring clients. The difference

between the disbursements and receipts at any given time represented the value of ACFC's

purchased accounts receivable, which was a current asset of ACFC. As of May 2002, the actual

balance of ACFC's purchased accounts receivable account -- or the amount by which ACFC

factoring disbursements or advances exceeded receipts -- was approximately $5.2 million.

22.     ACFC's general ledger also included several cash accounts. These cash accounts

recorded the value of cash held by ACFC in various bank accounts.

23.     Each month, Morrison created a financial reporting package summarizing

ACFC's financial performance. Morrison distributed the reporting package both to HPSC's

finance department for incorporation into HPSC's consolidated financial statements and to

Mount. The monthly package included, among other things, a schedule of ACFC's current

assets, including ACFC's purchased accounts receivable account and several ACFC cash

accounts.

24.     Each month from 1997 through May 2002, Morrison falsified ACFC's general

ledger to generate two different false schedules of ACFC's current assets, one for HPSC and one

for Mount. Morrison accomplished this by altering the ACFC general ledger on his computer

screen and generating a false schedule that he printed out in hard copy and mailed to HPSC.

Then, Morrison prepared a second set of altered reports for Mount. After printing the falsified

schedules for HPSC and Mount, Morrison corrected the numbers in the general ledger on his

computer to reflect the actual account balances.

25.     ACFC's actual balance of the purchased accounts receivable account steadily increased from $802,720 in January 1997 to $5.2 million by May 2002 due to the funds Morrison disbursed to Miller against the accounts receivable purportedly purchased from Miller. Morrison prepared fictitious asset schedules to conceal his improper advances to Miller and correspondent increases to the purchased accounts receivable account. In the schedules, he understated the actual balance of ACFC's purchased accounts receivable account at $500,000 to $600,000. To further conceal his scheme, he offset the understatement by increasing certain ACFC cash accounts by the amounts he had understated the balance of ACFC's purchased accounts receivable account.

26.     Morrison prepared a second set of fictitious schedules of current assets for Mount. Morrison altered these schedules to reflect an account balance of ACFC's purchased accounts receivable account at between $200,000 and $300,000. As with the fictitious schedules created for HPSC, Morrison offset the understated balance of the purchased accounts receivable account by overstating the balance of several ACFC cash accounts. Morrison apparently understated the balance of the purchased accounts receivable account in the fictitious schedules created for Mount to an even greater degree than in the schedules he provided HPSC to make the account appear insignificant and to avoid Mount's detailed review of ACFC's factoring operation.

27.     In 2001, Morrison also falsified accounting documents he provided to HPSC's outside auditor, Deloitte & Touche LLP ("Deloitte"). As described above, Morrison had altered the balance of several ACFC cash accounts in schedules reported to HPSC for inclusion in HPSC's consolidated financial statements to be filed with the Commission. The reported cash balances therefore did not match the cash account balances that appeared on ACFC's bank

statements. Thus, during Deloitte's 2001 year-end audit of HPSC's financial statements, Morrison provided false bank reconciliations to HPSC's auditors to further conceal his scheme.

28.    Morrison prepared and provided the auditors false bank reconciliations to support the fictitious balances reported in several ACFC cash accounts. In the reconciliations, Morrison represented there were "deposits-in-transit" for a given month (*e.g.* December 2001) that would be processed by the bank and appear on ACFC's statement the following month (*e.g.* January 2002). Morrison matched the purported deposits-in-transit to actual bank deposits against which HPSC's auditors could "verify" the purported deposits-in-transit. The total amount of the fictitious deposits-in-transit appeared to substantiate the artificially high balance of the ACFC cash accounts.

29.    During Deloitte's 2001 year-end audit, Morrison also provided to the auditors a fictitious summary schedule to support the 2001 year-end balances in the ACFC purchased accounts receivable account.

### Discovery of the Fraud

30.    On May 22, 2002, Morrison revealed to Mount that he had been concealing his diversion of ACFC funds to Miller for approximately four years. Morrison admitted that Miller failed to provide invoices to support the advances that he made to her or provided fictitious invoices. He further admitted to Mount that he created false bank reconciliations for the outside auditors to conceal what he had done.

31.    On May 24, 2002, Mount asked for and received Morrison's resignation.

9

## HPSC'S RESTATEMENT

32.     HPSC sustained a net financial loss of at least $4.7 million as a result of the funds Morrison diverted to Miller.  Overall, Morrison's fraudulent activity caused HPSC to sustain a $5.3 million loss from the end of 1996 until May 2002 due to additional accounting irregularities relating to Morrison's operation of ACFC's factoring business.

33.     On June 17, 2002, HPSC issued a press release announcing that "an employee of [ACFC] perpetrated a defalcation by which approximately $5 million was diverted over a period of the last four to five years."  The company stated that it likely would have to restate its financial results for the affected periods.

34.     On August 14, 2002, HPSC restated its Consolidated Balance Sheets and Statements of Operations for the years ended December 31, 1997 through December 31, 2001 and for the quarters ended March 31, 2000 through March 31, 2002.  HPSC identified and wrote off the funds Morrison diverted to Miller as a "Loss from employee defalcation."  A summary of the effects of the restatement on HPSC's financial statements is as follows:

| Reporting Period | HPSC Net Income, as Originally Reported | HPSC Net Income, as Restated | Overstatement (Percent) |
|---|---|---|---|
| Year end 1997 | $1,121,000 | $684,000 | $437,000 (64%) |
| Year end 1998 | $1,976,000 | $1,895,000 | $81,000 (4%) |
| Year end 1999 | $2,719,000 | $2,273,000 | $446,000 (20%) |
| Year end 2000 | $87,000 | ($739,000) | $826,000 (112%) |
| First quarter 2000 | $693,000 | $400,000 | $293,000 (73%) |
| Second quarter 2000 | $795,000 | $578,000 | $217,000 (38%) |
| Third quarter 2000 | $860,000 | $681,000 | $179,000 (26%) |
| Fourth quarter 2000 | ($2,261,000) | ($2,398,000) | $137,000 (6%) |
| Year end 2001 | $3,216,000 | $2,379,000 | $837,000 (35%) |

| Reporting Period | HPSC Net Income, as Originally Reported | HPSC Net Income, as Restated | Overstatement (Percent) |
|---|---|---|---|
| First quarter 2001 | $843,000 | $595,000 | $248,000 (42%) |
| Second quarter 2001 | $477,000 | $268,000 | $209,000 (78%) |
| Third quarter 2001 | $1,001,000 | $937,000 | $64,000 (7%) |
| Fourth quarter 2001 | $895,000 | $579,000 | $316,000 (55%) |
| First quarter 2002 | $1,001,000 | $824,000 | $177,000 (21%) |

| Reporting Period | HPSC Earnings per Share, as Originally Reported | HPSC Earnings per Share, as Restated | Overstatement (Percent) |
|---|---|---|---|
| Year end 1997 | $0.30 | $0.18 | $0.12 (67%) |
| Year end 1998 | $0.53 | $0.51 | $0.02 (4%) |
| Year end 1999 | $0.72 | $0.60 | $0.12 (20%) |
| Year end 2000 | $0.02 | ($0.19) | $0.21 (111%) |
| First quarter 2000 | $0.19 | $0.11 | $0.08 (73%) |
| Second quarter 2000 | $0.20 | $0.15 | $0.05 (33%) |
| Third quarter 2000 | $0.22 | $0.17 | $0.05 (29%) |
| Fourth quarter 2000 | ($0.57) | ($0.61) | $0.04 (7%) |
| Year end 2001 | $0.81 | $0.60 | $0.21 (35%) |
| First quarter 2001 | $0.21 | $0.15 | $0.06 (40%) |
| Second quarter 2001 | $0.12 | $0.07 | $0.05 (71%) |
| Third quarter 2001 | $0.25 | $0.24 | $0.01 (4%) |
| Fourth quarter 2001 | $0.23 | $0.15 | $0.08 (53%) |
| First quarter 2002 | $0.25 | $0.21 | $0.04 (19%) |

## FIRST CLAIM

### Fraud in the Purchase or Sale of Securities by Morrison
### (Violation of Section 10(b) of the Exchange Act and Rule 10b-5)

35.     The Commission repeats and incorporates by reference the allegations in

paragraphs 1- 34 of the Complaint as if set forth fully herein.

36.     For the years ended December 31, 1997 through December 31, 2001 and for the

quarters ended March 31, 2000 through March 31, 2002, Morrison's fraudulent conduct caused material overstatements of revenue and net income in HPSC's public statements and in its filings with the Commission.

37.     By reason of the foregoing, Morrison, directly or indirectly, acting intentionally, knowingly or recklessly, by use of the means or instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities:  (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material fact or omitted to state a material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices or courses of business which operated as a fraud or deceit upon certain persons, including purchasers or sellers of HPSC's securities, in violation of Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5].

38.     Morrison's conduct involved fraud, deceit, or deliberate or reckless disregard of regulatory requirements, and resulted in substantial losses or significant risk of substantial losses to other persons, within the meaning of Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)].

## SECOND CLAIM

### Falsification of Accounting Records And
### Circumvention of Internal Controls by Morrison
### (Violation of Section 13(b)(5) of the Exchange Act and Rule 13b2-1)

39.     The Commission repeats and incorporates by reference the allegations in paragraphs 1- 34 of the Complaint as if set forth fully herein.

40.     As set forth above, Morrison knowingly recorded false entries on ACFC's books

and records by, including, but not limited to, falsifying the purchased accounts receivable and

cash accounts in ACFC's general ledger, providing fictitious financial reports to HPSC, ACFC's

president and HPSC's outside auditors, falsifying bank reconciliations, and providing fictitious

summary schedules of ACFC's factoring accounts to HPSC's outside auditors.

41.     By reason of the foregoing, Morrison knowingly, directly or indirectly, falsified

or caused to be falsified HPSC's books, records and accounts and circumvented HPSC's system

of internal accounting controls in violation of Section 13(b)(5) of the Exchange Act [15 U.S.C.

§78m(b)(5)] and Rule 13b2-1 thereunder [17 C.F.R. §240.13b2-1].

42.     Morrison's conduct involved fraud, deceit, or deliberate or reckless disregard of

regulatory requirements, and resulted in substantial losses or significant risk of substantial losses

to other persons, within the meaning of Section 21(d)(3) of the Exchange Act [15 U.S.C.

§78u(d)(3)].

### THIRD CLAIM

### Unjust Enrichment of Relief Defendant Miller

43.     The Commission repeats and incorporates by reference the allegations in

paragraphs 1- 34 of the Complaint as if set forth fully herein.

44.     Miller has no legitimate interest in, or right to, the funds received from ACFC,

which are currently being held by her, and therefore, in equity and good conscience, she should

not be allowed to retain such funds.

45.     As a result, Miller is liable for unjust enrichment and should be required to return

her ill-gotten gains, with pre-judgment interest.

## **PRAYER FOR RELIEF**

I.

WHEREFORE, the Commission requests that the Court issue an asset freeze order

against Relief Defendant Miller pending resolution of this action.

II.

WHEREFORE, the Commission requests that the Court issue a final judgment:

A       Permanently enjoining Morrison and each of his agents, servants, employees and

attorneys and those persons in active concert or participation with them, who receive actual

notice of the injunction by personal service or otherwise, including facsimile transmission or

overnight delivery service, from engaging, directly or indirectly, in violations of:

        1.      Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5];

        2.      Section 13(b)(5) of the Exchange Act [15 U.S.C. §78m(b)(5)] and Rule 13b2-1 thereunder [17 C.F.R. §240.13b2-1];

B.      Ordering Morrison to pay an appropriate civil monetary penalty pursuant to

Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)];

C.      Ordering Morrison to disgorge all ill-gotten gains, plus prejudgment interest

thereon;

D.      Ordering Miller to relinquish all unjust enrichment, plus prejudgment interest

thereon;

E.      Permanently prohibiting Morrison, pursuant to Section 21(d)(2) of the Exchange

Act [15 U.S.C. §78u(d)(2)], from serving as an officer or director of any issuer required to file

reports with the Commission pursuant to Sections 12(b), 12(g) or 15(d) of the Exchange Act [15

14

U.S.C. §§78l(b), 78l(g) and 78o(d)]; and

     F.    Awarding such other and further relief as the Court deems just and proper.

Respectfully submitted,

*Linda B Bridgman*

JUAN MARCEL MARCELINO
District Administrator

Linda B. Bridgman (DC Bar No. 304824)
District Trial Counsel

Kate Poverman (Illinois Bar No. 6194023)
Assistant District Administrator

Gary T. Grassey (BBO # 636687)
Branch Chief

Andrew D. Caverly (BBO # 639582)
Senior Counsel

Ian D. Roffman (BBO # 637564)
Staff Attorney

Attorneys for Plaintiff
**SECURITIES AND EXCHANGE COMMISSION**
73 Tremont Street, Suite 600
Boston, MA  02108
(617) 424-5929 (Bridgman)
(617) 424-5900  ext. 119 (Roffman)
(617) 424-5940  fax

Dated: August 16, 2002